UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Anthony Michael Betourney-Pavao,
on behalf of Hugh Mandly, deceased,

       Plaintiff,

      v.                                      Civil Action No. 2:11-CV-68

Michael J. Astrue,
Commissioner of Social Security,

       Defendant.

## OPINION AND ORDER
(Docs. 18, 19)

Plaintiff Anthony Michael Betourney-Pavao brings this action on behalf of Hugh Mandly[1] pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying Mandly's application for disability insurance benefits. Pending before the Court are Betourney-Pavao's motion to reverse the Commissioner's decision (Doc. 18), and the Commissioner's motion to affirm the same (Doc. 19).

For the reasons stated below, the Court GRANTS Betourney-Pavao's motion; DENIES the Commissioner's motion; and REMANDS for further proceedings and a new decision.

---

[1] On January 4, 2011, while his disability application was pending before the Decision Review Board ("DRB"), Mandly died. (Doc. 3, ¶ 5.) Accordingly, Mandly's minor son, Anthony Michael Betourney-Pavao, brings this action on behalf of Mandly. *See* 20 C.F.R. § 404.503(b)(2).

## **Background**

Mandly was fifty years old on his alleged disability onset date of December 1, 2008.  He completed school through the ninth grade, and thereafter joined the military.  (AR 20, 291.)  He worked as a cashier, a warehouse worker, and a custodian at an elderly housing facility; and also held various part-time jobs, including pumping gas and working as a school janitor.  Mandly lived with his ex-wife for much of the alleged disability period, although at the time of the administrative hearing, he was living with his mother-in-law.  (AR 28-29, 149, 177.)  He had a son who was approximately five years old at the beginning of the alleged disability period, and another son who died in 1997 at the age of thirteen.  (AR 291, 580, 1540, 1572.)

Mandly suffered from numerous medical issues, including low back pain, left shoulder pain, chronic obstructive pulmonary disease ("COPD"), pulmonary hypertension, cardiac problems, and chronic subdural hematomas.  He also had a significant history of alcohol and drug abuse, resulting in numerous hospital admissions and treatment at residential rehabilitation programs.  (AR 867-68, 1538-40, 1572.)  In December 2008 and January 2009, Mandly was admitted to the Northwestern Medical Center ("NMC") on several occasions due to altered mental status, falls due to intoxication, and cardiac arrest surrounding complications of sepsis.  (AR 540-43, 832, 843, 856-57, 867-70.)  Again in October 2009, he was admitted to the NMC with "an accidental overdose and alcoholism w[ith] acute mental status changes" (AR 1617; *see* AR 1565-67); and in November 2009, he was admitted after falling three times in a grocery store and reporting that he had drank beer and taken more pain medication than

prescribed (AR 1427). A December 2009 report indicates that Mandly suffered bilateral subdural hematomas as a result of the November falls, and was admitted to inpatient rehabilitation for "comprehensive therapy efforts" due to functional limitations. (AR 1261; *see* AR 1421.) At the time of discharge, although he was able to complete activities of daily living, Mandly "continue[d] to require cues for all activities including medication management," and he had "some short-term memory loss." (AR 1421.)

In January 2009, Mandly filed an application for social security disability insurance benefits. Therein, he alleged that he became unable to work on March 24, 2007 as a result of chronic back pain, a heart condition, fatigue, and pain. (AR 161-62.) Later, he added that his left clavicle was broken, and that, since February 2009, he became "very tired" and had to take a nap daily and rest after standing and walking. (AR 205.) On August 23, 2010, Administrative Law Judge ("ALJ") Thomas Merrill conducted a hearing on Mandly's application. (AR 16-46.) Mandly appeared and testified, and was represented by counsel. During the hearing, Mandly stated that he "really didn't have any problems" in 2007 (AR 23), and thus amended his alleged disability onset date to December 1, 2008 (AR 24).

On October 21, 2010, the ALJ issued a decision finding that Mandly was not disabled under the Social Security Act from his amended alleged onset date through the date of the decision. (AR 7-16.) Less than three months later, on January 4, 2011, Mandly died from respiratory failure due to septic shock and liver disease. (*See* Doc. 15-2.) On February 2, 2011, approximately one month after Mandly's death, the DRB notified Mandly that it had not completed its review during the time allowed, thus

making the ALJ's decision final.  (AR 1-3.)  Having exhausted all administrative remedies, on March 18, 2011, Mandly's son filed the Complaint in this action on behalf of Mandly.  (Doc. 3.)

### ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), meaning "the most [the claimant] can still do despite [his or her mental and physical] limitations," based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945.  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the

claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Mandly had not engaged in substantial gainful activity since his alleged disability onset date of December 1, 2008.  (AR 9.)  At step two, the ALJ found that Mandly had the following severe impairments: degenerative disc disease of the lumbar spine, status post fracture of the left clavicle, COPD, pulmonary hypertension, and a history of polysubstance abuse.  (*Id.*)  Conversely, the ALJ found that Mandly's chronic liver disease was nonsevere.  (AR 10.)  The ALJ then stated as follows, in conflict with his earlier finding that Mandly's polysubstance abuse was severe: "[Mandly's] medically determinable mental impairments of a history of polysubstance abuse, considered singly and in combination, do not cause more than minimal limitation in [Mandly's] ability to perform basic mental work activities and are therefore nonsevere."  (AR 10.)  At step three, the ALJ determined that none of Mandly's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 11-12.)

Next, the ALJ determined that Mandly had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b), except that he was limited to only "occasional"

5

balancing, climbing, and reaching above shoulder level with the left arm.  (AR 12.) Given this RFC, and considering the vocational expert's testimony, the ALJ found that Mandly was capable of performing his past relevant work as a cashier.  (AR 14-15.)  The ALJ concluded that Mandly had not been under a disability from the alleged onset date of December 1, 2008 through the date of the decision.  (AR 15.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.*

*Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Betourney-Pavao argues that the ALJ erred in his analysis of the medical opinions, and specifically, that the ALJ did not properly weigh the competing opinions of treating physician Dr. Michael Corrigan and non-examining, agency consultant physicians Drs. Cynthia Short, Geoffrey Knisely, and Harris Faigel. The Commissioner responds by contending that the ALJ properly determined Mandly's RFC, and was entitled to give greater weight to the agency consultants' opinions than to those of the treating physician.

Dr. Michael Corrigan was Mandly's treating primary care physician from February 2009 through the date of the ALJ's decision in October 2010. (AR 951.) He treated Mandly frequently during that period for multiple ailments, including but not limited to alcoholism, a seizure disorder, a chronic subdural hematoma, COPD, pulmonary hypertension, low back pain, and left shoulder pain. (AR 1236-37.) Dr. Corrigan referred Mandly to multiple specialists during the alleged disability period, who submitted their reports to him. In March 2010, Dr. Corrigan opined that Mandly's

7

impairments caused "[e]xtreme" limitations in Mandly's ability to concentrate and focus on job-related tasks.  (AR 1296.)  He further opined that Mandly would be greatly slower in his ability to complete tasks; would need more than ordinary rest breaks in a workday; could perform activities for only fifteen minutes before needing to rest for fifteen minutes; could only occasionally lift or carry less than ten pounds; could sit for only twenty minutes at a time; could stand and walk for only twenty minutes at a time; would need to lie down over the course of an eight-hour workday; and would be absent from work "very frequent[ly]" as a result of increased anxiety, depression, low back pain, and left shoulder pain.  (AR 1296-1300.)  In another report from March 2010, Dr. Corrigan stated that Mandly's anxiety, depression, and alcoholism would cause "substantial loss of ability" in work-related tasks and would cause him to be absent from work "daily."  (AR 1287-88.)  A few months later, in July 2010, Dr. Corrigan completed a form stating that he had seen Mandly for regular follow-up visits in April, May, and June; and that Mandly's condition had remained the same.  (AR 1621.)

     Under the "treating physician rule," a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  20 C.F.R. § 404.1527(d)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567-69 (2d Cir. 1993).  Even when a treating physician's opinion is not given controlling weight, the opinion is still entitled to significant consideration, given that the treating physician "[is] likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's]

medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).  "Under the Commissioner's regulations, the ALJ must consider the following factors when assigning weight to the opinion of a treating source: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) whether the treating physician presents relevant evidence to support an opinion, particularly medical signs and laboratory findings; (4) whether the treating physician's opinion is consistent with the record as a whole; (5) [and] whether the treating physician is a specialist in the area relating to [his or] her opinion . . . ."  *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); 20 C.F.R. § 404.1527(d)(2)-(6)).  After considering these factors, the ALJ must give "good reasons" for the weight afforded to the treating physician's opinion.  *Burgess v. Astrue*, 537 F.3d 117, 129-30 (2d Cir. 2008); *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

    Here, the ALJ failed to consider the length, frequency, and nature of Dr. Corrigan's treatment relationship with Mandly.  This was error, considering that Mandly suffered from numerous medical problems; and Dr. Corrigan, as Mandly's most long-standing treating provider, was in the best position to observe and evaluate the combined effects thereof.  The ALJ did, however, provide a fairly detailed analysis of Dr. Corrigan's opinions, stating that he gave them "little weight" on the grounds that they were not well-supported and were inconsistent with "other substantial evidence of

9

record," including the agency consultant opinions which the ALJ gave "great weight." (AR 14.)

With respect to Mandly's back pain, the ALJ stated that Dr. Corrigan's opinions were not well-supported because: (a) MRI testing showed "no significant neural compromise"; (b) Mandly maintained "normal motor and sensory function"; and (c) Mandly reported "only some tenderness" of the lumbar spine to Dr. Corrigan in October 2009. (*Id.*) But in the treatment note that the ALJ described as including Mandly's report of "only some tenderness," Dr. Corrigan in fact states "[lumbar spine] tender" (AR 1616), which supports the existence of back pain rather than opposing it, as posited by the ALJ. The same treatment note also states that Mandly had increasing left shoulder and back pain and decreased range of motion. (*Id.*) Treatment notes from back specialist Dr. Michael Barnum are consistent with these complaints of pain and decreased range of motion, including a diagnosis of "[r]adiculopathy of the right lower extremity with mechanical lower back pain" in May 2009 (AR 1218), recognition of "degenerative changes from L2-S1" in June 2009[2] (AR 1216), recording of "equivocal tension signs" and "a reverse lumbofemoral rhythm" in April 2010 (AR 1318), and a diagnosis of "multilevel degenerative disease with facet arthrosis" in May 2010 (AR 1317). Likewise, a January 2010 physical therapy assessment documents Mandly's back pain and reduced range of motion, indicating that Mandly "present[ed] with decreased [range of motion]

---

[2] The same treatment note also states that an MRI revealed "no significant neural compromise" in Mandly's lumbar spine. (AR 1216.) The ALJ cites to this statement in support of his finding that Dr. Corrigan's opinion is not well-supported. (AR 14.) But neither the ALJ nor the Commissioner has explained why it was not medically possible for Mandly to experience the level of pain, fatigue, and functional impairment that Dr. Corrigan opined he experienced, while at the same time having "no significant neural compromise" in his lumbar spine.

10

and strength [in the] low back [and] moderate to severe pain [in the] low back, impaired [activities of daily living], impaired work tasks/household chores, impaired sleep, and impaired recreational activities." (AR 1400.) Although this evidence was largely consistent with Dr. Corrigan's opinions, the ALJ did not discuss it in his assessment thereof. Moreover, as discussed in more detail below, the agency consultants did not consider most of this evidence, as it was not created until after they completed their reports.[3]

The only medical opinions cited by the ALJ in opposition to the opinions of Dr. Corrigan are those of agency consultants Drs. Knisely, Faigel, and Short. (*See* AR 1208-15, 1233, 1257-58.) The ALJ erred in failing to consider that none of these consultants examined or treated Mandly, in contrast to Dr. Corrigan. The ALJ also erred in failing to recognize that each of these consultants' reports was prepared before Dr. Corrigan offered his 2010 and 2011 opinions, and thus none of these consultants had the opportunity to consider Dr. Corrigan's opinions in their reports.[4] *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is unclear whether agency consultant reviewed "all of [plaintiff's] relevant medical information," consultant's opinion is not supported by evidence of record, as required to override the opinion of a treating physician). Specifically, the most recent of the consultants' opinions was made in

---

[3] The only exceptions are that Dr. Knisely's and Dr. Faigel's reports were prepared after Dr. Barnum's May and June 2009 records were prepared. However, Dr. Knisely does not mention the May 2009 diagnosis of radiculopathy (AR 1233), and Dr. Faigel does not consider Mandly's back pain, other than to note that Mandly "alleg[es] disability . . . due to chronic back pain" and to "agree" with another consultant's findings regarding Mandly's physical limitations generally (AR 1257).

[4] Dr. Short even checked off a box in her report stating that there was "[n]o" medical source statement regarding Mandly's physical capacities in the file. (AR 1214.)

11

September 2009 (AR 1257-58), approximately six months before Dr. Corrigan made his March 2010 opinions. The consultant opinions were thus deficient in two ways: (1) they failed to consider the opinions of Dr. Corrigan, Mandly's long-standing treating physician, who had more of a whole picture of Mandly's health and functional abilities than the consultants could have had; and (2) they failed to account for any deterioration in Mandly's condition after the date of their opinions. It is not clear if the ALJ recognized these deficiencies, as he did not mention them in his decision, other than to state that Dr. Knisely's assessment "was prior to [Mandly's] treatment [of] his left clavicle." (AR 14.)

Additionally, the consultant opinions did not consider results from an October 2009 MRI of the left shoulder, a November 2009 cardiac ultrasound, a November 2009 chest x-ray, a November 2009 CAT scan of the cervical spine, an April 2010 liver function test, and a May 2010 MRI of the lumbar spine.[5] (*See* AR 1368-70, 1373, 1376-77, 1383, 1528.) Each of these reports appears to record at least minimally abnormal findings, and was not in the record when the agency consultants made their opinions. Given that the ALJ gave "great weight" to these opinions, this relevant medical evidence should have been considered by the consultants. It is not for the ALJ, much less the court, to decipher the practical significance of these medical reports. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (holding that ALJ may "choose between properly

---

[5] The agency consultants also did not consider the September 2009 treatment notes of treating cardiologist Dr. William Hopkins, which indicated that Mandly "note[d] that he ha[d] been feeling fatigued and washed out and [wa]s having difficulty doing physical things" (AR 1365); or the March 2010 treatment notes of Dr. Hopkins' physician assistant, Gregory Ehle, which recorded that Mandly complained of fatigue, lethargy, and "mild dyspnea with exertion" (AR 1361).

submitted medical opinions," but may not "set his own expertise against that of [ ] physician[s]" who submitted opinions to him); *Berrios v. Sec'y of Health and Human Servs.*, 796 F.2d 574, 576 (1st Cir. 1986) ("We cannot decipher the medical jargon in this report and we do not understand the significance of the various clinical tests.  We do not think the Appeals Council, composed of lay persons, was competent to interpret and apply this raw, technical medical data."); *Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings.").

      The Commissioner contends that, "[a]s a general rule, the ALJ was entitled to give greater weight to the three consulting physicians' opinions."  (Doc. 19 at 7.)  It is true that the regulations permit the opinions of non-examining agency consultants to override those of treating sources when the former are supported by evidence in the record and the latter are not.  *See* SSR 96-6p, 1996 WL 374180, at *3 (1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); 20 C.F.R. § 404.1527(f)(2)(ii) ("State agency . . . psychological consultants . . . are highly qualified . . . medical specialists who are also experts in Social Security disability evaluation . . . ."). However, the Second Circuit has repeatedly held that, *in general*, reports from non-examining providers deserve less weight than those of examining providers.  *Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The court applied this rule in *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990):

> In . . . elevating the opinion of the medical adviser, who never had examined [the claimant], over that of Dr. Pajela, [the claimant's] treating physician, the ALJ violated a general rule adopted in all, or virtually all, of the circuits.
>
> Dr. Galst's job as a medical adviser was to explain complex medical problems in terms understandable to lay examiners. *The general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.* The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.

*Id.* (citations and quotations omitted) (emphasis added).

In support of the claim that ALJs may, in general, give greater weight to the opinions of consulting physicians than to those of treating physicians, the Commissioner cites to the following statement made by the Seventh Circuit in *Hofslien v. Barnhart*, 439F.3d 375, 377 (7th Cir. 2006): "[T]he fact that the claimant is the treating physician's patient . . . detracts from the weight of that physician's testimony, since . . . many physicians . . . will often bend over backwards to assist a patient in obtaining benefits." (*See* Doc. 19 at 7.) That statement, however, appears to be mere dicta. If actually applied, the principle that the opinions of treating physicians are generally *less* valuable than other evidence would obliterate the well-established treating physician rule which states just the opposite. *See* 20 C.F.R. § 404.1527(d)(2) ("Generally, we give more weight to opinions from your treating sources . . . ."); SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996) ("Treating source medical opinions are . . . entitled to deference and must be weighed using all of the [regulatory] factors."). Furthermore, the Seventh Circuit ultimately held in *Hofslien* that "the weight properly to be given to testimony or other

evidence of a treating physician depends on [the] circumstances." *Hofslien v. Barnhart*, 439F.3d at 377.  More recently, the Second Circuit helpfully simplified the issue, stating that, regardless of how the treating physician rule functions when there is evidence contradictory to a treating physician's opinion, "the rule imposes on the Commissioner a heightened duty of explanation when a treating physician's medical opinion is discredited." *Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199 n.1.  Here, the ALJ did not effectively explain why he discredited Dr. Corrigan's opinions, and there is no indication that Dr. Corrigan intentionally skewed his opinions to support disability.

In sum, the ALJ did not apply the required factors in assessing the opinions of treating physician Dr. Corrigan, and did not give "good reasons" for affording little weight to those opinions.  Instead, the ALJ erroneously afforded great weight to the agency consultant opinions, despite the fact that they were rendered at a time when significant medical evidence, including the opinions of Dr. Corrigan, were not yet a part of the record.  Because the ALJ erred in his analysis of the medical opinions, the Court does not reach the other arguments made in the parties' motions, and expresses no opinion on the ultimate question of disability.  On remand, however, the ALJ should revisit the issue of the severity of Mandly's polysubstance abuse, as discussed below.

When faced with a claimant like Mandly who has a drug or alcohol addiction, the ALJ is required to consider an extra step in the five-step sequential evaluation. *Salazar v. Barnhart*, 468 F.3d 615, 622 (10th Cir. 2006).  The Social Security Act states:  "An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's

determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); *see Porter v. Chater*, 982 F. Supp. 918, 921-22 (W.D.N.Y. 1997). Accordingly, if the ALJ finds that the claimant is disabled, and there is medical evidence of the claimant's drug addiction or alcoholism, the ALJ "must determine whether [that] drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a).

Here, the ALJ found that Mandly's "history of polysubstance abuse . . . d[id] not cause more than minimal limitation in [Mandly's] ability to perform basic mental work activities and [was] therefore nonsevere."[6] (AR 10.) Given this finding, the ALJ did not conduct the above analysis to determine whether Mandly's substance abuse was a contributing factor material to the determination that Mandly was disabled. But the record does not support the ALJ's finding that Mandly's polysubstance abuse was a nonsevere impairment.[7] Rather, the record clearly reveals that Mandly had a very serious drinking problem, which limited his ability to function (let alone work) and resulted in many medical admissions and inpatient treatment during the alleged disability period.

The ALJ defended his finding that Mandly's polysubstance abuse was nonsevere by stating that agency consultant Dr. Thomas Reilly noted there was "no history of psychiatric services aside from treatment for polysubstance abuse," and that this finding

---

[6] As noted earlier, despite making this finding, the ALJ conflictingly included "a history of polysubstance abuse" in his list of Mandly's "severe impairments." (AR 9.) This apparently was a typographical error, given the ALJ's later explanation that the polysubstance abuse did not cause more than minimal limitation in Mandly's ability to work. (AR 10.)

[7] The Commissioner appears to agree that Mandly's polysubstance abuse significantly affected his ability to function during the alleged disability period. (*See* Doc. 19 at 14 ("it appears that [Mandly's] fatigue may have been due to intoxication"); ("Mandly . . . presented at Northwestern Medical Center . . . complaining of fatigue, which was the result of . . . overdosing on his prescription pain killers, and drinking beer"); ("during the same time period in which he denied drinking to his cardiac providers, he was clearly abusing substances, which resulted in fatigue") (citations omitted).)

16

was supported by (a) the findings of examining consultant Dr. Dennis Reichardt that Mandly "exhibited average intellectual functioning, animated affect[,] and logical thinking," and (b) the observations of Dr. Brian Erickson that Mandly had "normal psychomotor activity, intact concentration and attention, logical thought processes[,] and 30/30 results on MMSE testing." (AR 10.) First, this reasoning is flawed. Essentially, the ALJ defends his determination that Mandly's polysubtance abuse was not severe by stating that Mandly had no severe mental impairment. But it is possible for a claimant to have polysubstance abuse and not a separate mental impairment. Moreover, the ALJ's analysis excludes the possibility that Mandly's alcohol abuse resulted in physical limitations, although the record very clearly reveals that it did.

Second, the ALJ erred in relying on Dr. Reilly's opinion to support the finding that Mandly's polysubstance abuse was not a severe impairment. Dr. Reilly's report clearly indicates that he excluded Mandly's polysubstance abuse from his opinion. The report states: "[Mandly has] essentially no [history of] psych[iatric] services *aside from [treatment for polysubstance abuse]*"; and, "*in the absence of [alcohol and drug abuse]*, [Mandly] has essentially no residual limitations w/ management of routine tasks in low stress contexts due to adjustment disorder features." (AR 1206 (emphasis added).) With respect to Dr. Reichardt's and Dr. Erickson's reports, they do not support the ALJ's finding that Mandly's polysubtance abuse was nonsevere. Dr. Reichardt's report states: "[Mandly's] impulse control around substance abuse has certainly been poor" and "[h]is judgment is obviously poor." (AR 292.) And Dr. Erickson's report states: "[Mandly had] a significant history of alcohol dependence . . . [and] . . . substance abuse." (AR

17

581.)  The report also notes that Mandly was planning on enrolling in a subacute rehabilitation program and thereafter might require "ongoing substance abuse treatment including inpatient or outpatient rehabilitation programs."  (*Id*.)  Although these findings conflict with the ALJ's determination that Mandly's polysubstance abuse was nonsevere, the ALJ did not mention them in his decision.

## Conclusion

The Court concludes that the ALJ failed to properly analyze the medical opinions, and erred in determining that Mandly's polysubstance abuse was nonsevere.  Therefore, the Court GRANTS Betourney-Pavao's motion (Doc. 18); DENIES the Commissioner's motion (Doc. 19); and REMANDS for further proceedings and a new decision, in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 4th day of April, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge